**COMMODITY CREDIT CORP.**

v.

**DRAPER & CO., Inc.**

No. 4782.

United States Court of Appeals
First Circuit.

May 6, 1954.

Rehearing Denied June 14, 1954.

Edward H. Hickey, Attorney, Department of Justice, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., Anthony Julian, U. S. Atty., Boston, Mass., and Paul A. Sweeney, Attorney, Department of Justice, Washington, D. C., on brief), for appellant.

Edward C. Park, Boston, Mass. (Charles C. Worth and Wirthington, Cross, Park & McCann, Boston, Mass., on brief), for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

The plaintiff Draper & Company, Inc., instituted this action against the defendant Commodity Credit Corporation, in the United States District Court for the District of Massachusetts. The complaint alleges that the parties had entered into certain contracts and that the

plaintiff has duly performed all of the conditions required by the contracts but that the defendant wrongfully refused to accept delivery of and pay for shipments of wool tendered by the plaintiff. In its answer the defendant alleges that it refused to accept and pay for the wool tendered to it because the plaintiff's voluntary acts had rendered the wool ineligible for sale or delivery to the defendant under the terms of the contracts. The defendant also filed an amended counterclaim for liquidated damages specified in the contracts. The district court held that the wool tendered by the plaintiff met the conditions imposed by the contracts and entered judgment on July 13, 1953 for the plaintiff for the sum of $76,831.04 with interest thereon from September 30, 1951 to July 9, 1953, in the amount of $8,182.52 and costs and dismissed the defendant's counterclaim.

The following facts were either stipulated by the parties or were unchallenged findings made by the district court.

1. Plaintiff, Draper & Company, Inc., is a corporation organized under the laws of the Commonwealth of Massachusetts engaged in the buying and selling of domestic and foreign wools.

2. Defendant, Commodity Credit Corporation, is a federal corporation created by the Commodity Credit Corporation Charter Act, 62 Stat. 1070, 15 U.S.C.A. § 714 et seq.

3. On September 27, 1950, Congress enacted the Supplemental Appropriation Act of 1951, P.L. 843, 81st Congress, 64 Stat. 1044 which provided in Chapter X, subtitle "Quartermaster Corps", in pertinent part as follows:

"* * * contracts may be made for the purchase of 100,000,000 pounds of raw wool, woolen garments, fabrics, and knitting yarns for use of all the armed services". 64 Stat. 1059.

4. On or about October 25, 1950, the defendant sent to the various Wool Trade Associations a telegram, * * * inviting each association to send a representative to the United States Department of Agriculture in Washington, D. C., to participate in a discussion of a procurement program under which defendant would acquire certain foreign wools for the Quartermaster General of the Department of the Army.

5. In response to defendant's telegram, on or about November 7, 1950, the Boston Wool Trade Association, through its Washington counsel, submitted "Recommendations for Purchase Agreement to Cover Commodity Credit Corporation Wool Purchases" dated November 6, 1950, * * *.

6. The Committee of the Boston Wool Trade Association which prepared such Recommendations was composed, among others, of the Public Relations Committee, the Chairman of which was Mr. Malcolm Green, President of plaintiff corporation.

7. Pursuant to P.L. 843, the Quartermaster General, Department of the Army, on December 5, 1950, entered into a Wool Purchase Contract with the defendant, Commodity Credit Corporation, authorizing said defendant to acquire and sell to the Quartermaster General 30,000,-000 pounds (minus the tolerance of 5%) clean basis of wool produced outside the United States. Said contract further provided that delivery to Commodity Credit Corporation under its purchase contract would be in bond without payment of custom duties.

8. In accordance with its contract with the Quartermaster General, the defendant on or about December 6, 1950, issued Public Announcement LS–262 stating its intention to purchase about 30,000,000 pounds of wool and setting forth the terms and conditions upon which offers to sell could be made.

9. Announcement LS–262 contained the following provisions:

"The Commodity Credit Corporation hereby announces its intention to purchase wool in a quantity of approximately 30,000,000 pounds clean basis. Wool offered for sale to the Commodity Credit Corporation under this announcement must meet

38

the specifications as set out in schedule A attached hereto, as provided in paragraph 3 hereof, and must not have had United States Customs' duties paid thereon. Such wool is to be offered for sale to Commodity Credit Corporation on or before June 30, 1951. Commodity Credit Corporation reserves the right to reject any or all offers and to increase or decrease the quantity of wool with respect to which it invites offers of sale. Such wool will be purchased subject to the following terms and conditions:

"2. *Eligible Wool.* Wool eligible for sale to Commodity Credit Corporation shall be wool offered to Commodity Credit Corporation for delivery in bond in the warehouse in the continental United States, designated by the vendor in the offer of sale. However, unless otherwise announced, only wool offered for delivery in store at the Boston Army Base, Boston, Massachusetts, will be considered. * * *

"3. *Specifications.* Only the types and grades of wool shown in Schedule A attached hereto will be considered for acceptance under this announcement."

Schedule A attached to the announcement listed by numbered items the types and grades of wool which the defendant considered purchasing. Item 234 was described as follows:

"Buenos Aires 5—S (40–s) Super Fleeces, fully skirted, Practically free 5½"—8"."

10. The terms and conditions of the announcement were specifically made part of the contracts entered into by the plaintiff and the defendant and were arrived at after consultation and upon the recommendations of representatives of the wool trade including the president of the plaintiff corporation.

11. On December 18, 1950, the plaintiff made telegraphic offers, in the form prescribed by the announcement and confirmed as therein provided, to sell to the defendant ninety-eight thousand pounds of wool, item 234, at a dollar and eighty-eight cents per pound, clean basis, in bond, and an additional ninety-eight thousand pounds of wool, item 234, at a dollar and eighty-seven cents per pound, clean basis, in bond. Both offers were for delivery at Boston Army Base, Boston, not later than March fifteenth, 1951. On December 20, 1950, the defendant sent the plaintiff a telegram accepting the offers, and thereafter confirmed the contract in writing. The contract was designated by the defendant by the symbols A1PM (FF) 27042. * * *

12. On December 26, 1950, the plaintiff made a telegraphic offer, in the form prescribed by the announcement and confirmed as therein provided, to sell to the defendant one hundred and ninety-six thousand pounds of wool, item 234, at one dollar and eighty-eight cents per pound, clean basis, in bond, for delivery at Boston Army Base, Boston, not later than March fifteenth, 1951. On December 27, 1950, the defendant sent the plaintiff a telegram accepting the offer, and thereafter confirmed the contract in writing. The contract was designated by the defendant by the symbols A1PM (FF)—27058. * * *

13. Each contract provided that it would be satisfied by delivery of the contract quantity within a plus or minus tolerance of 10% in pounds. Each contract further provided for liquidated damages upon plaintiff's failure to deliver wool at the rate of 5% of the contract sales price.

14. On January 2, 1951, The Bureau of Customs, at the request of the Quartermaster General, designated the Boston Army Base a Customs Bonded Warehouse, Class 2, for the purposes of the wool purchase program.

15. At the request of the plaintiff, the contracts were amended, extending the delivery date to April 30, 1951.

16. The plaintiff bought wool in Argentina, imported it into the United States, and tendered physical delivery of the same to the defendant at the Boston Army Base in April of 1951. The

duties on this wool had not been paid, and the wool was entered for warehouse under plaintiff's General Term Bond.

The defendant accepted only one hundred bales, or about 98,000 pounds, under the contract made on December 20, 1950, and rejected the balance as not in conformity with the description of item 234.

17. In May, 1951, the plaintiff sold 126 of the rejected bales to Bigelow-Sanford Carpet Company. These bales were withdrawn from warehouse conditionally free of duty under par. 1101, Tariff Act of 1930, and responsibility for any duties was transferred to Bigelow-Sanford under its bond.

18. In June, 1951, plaintiff wrote the defendant asking that the delivery dates on the remaining two contracts be extended in order that the wool previously rejected could be replaced by the plaintiff. The defendant agreed to and extended the time for performance under the contracts to September 30, 1951.

19. The plaintiff purchased from the Bigelow-Sanford Carpet Company approximately 178 bales of Item 234, which were in a customs bonded warehouse and under the custody of the United States Customs Bureau. This wool, approximately 169,414 pounds in the grease, tendered for delivery by plaintiff in July was accepted by the defendant in part performance of the contract of December 27, 1950, thus leaving a balance of approximately 126,586 pounds to be delivered in completion of the contracts.

20. The plaintiff also repurchased the 126 bales of wool, previously rejected by the defendant, from Bigelow plus twenty-three other bales which plaintiff had imported from Argentina in April, 1951, and had sold to Bigelow for carpet manufacture. The additional twenty-three bales had been entered conditionally free of duty under bond.

21. The plaintiff then proceeded to regrade the 149 bales of wool so repurchased from Bigelow together with five other bales of wool which plaintiff had imported and entered for warehouse in February and April, 1951.

22. As a result of the regrading, the plaintiff obtained 261 bales of wool of which it set aside 237 bales for tender to the defendant under its contracts. These 237 bales had a net weight of 124,727 pounds.

23. On September 7, 1951, the plaintiff tendered delivery of the 237 bales of regraded wool to the defendant at the Boston Army Base, but the defendant refused to accept them.

24. On September 7, 1951, the duties on the 237 bales had not been paid but the plaintiff was contingently liable therefor under its General Term Bond.

25. The 237 bales were fully up to the physical specifications of the contracts, and an inspection certificate so stating was signed but not issued to the plaintiff. The sole reason given by defendant for its refusal to accept the wool was that defendant considered the wool as ineligible under the contract since it had been regraded from wool which had been given a conditional free entry under a "carpet bond" and hence was regarded by defendant as not being wool "in bond" within the terms of the contract.

The fundamental question presented for our decision on the above facts is whether or not the 237 bales of wool tendered by the plaintiff and rejected by the defendant on September 7, 1951 were "in bond" as required by paragraph 2 of Announcement LS–262, which was specifically made part of the contracts entered into by the parties.[1]

The plaintiff contends that wool "in bond" means wool upon which custom duties were not paid but were secured by bond. Since the duties on the wool tendered by the plaintiff had not been paid but were secured under the plaintiff's General Term Bond, the plaintiff asserts that the defendant was not justified in refusing to take delivery of the tendered wool. The defendant, on the

---

1. See Findings Nos. 9 and 10, supra.

other hand, argues that the phrase "in bond" was intended by the parties to mean wool which has not been released from the custody of the Customs authorities and has not therefore entered the domestic commerce of the United States. It argues that, since the rejected wool had been released by the Customs authorities under a "carpet bond" and thus had entered the domestic commerce of the United States, it was justified in refusing to take delivery of the wool.

The plaintiff has presented strong arguments in support of its interpretation of the phrase "in bond." It contends that the phrase is generally used to qualify a quoted price, rather than as a reference to the status of physical custody over imported goods maintained by the Customs authorities before release for consumption. To substantiate its contention, the plaintiff introduced in evidence exhibits of confirmations of sales between it and third parties in which a quoted price is followed by the letters "I.B." or "In Bond." Furthermore in the contract between the defendant and the Quartermaster General the words "in bond" are immediately followed by the words "without payment of customs duties." In addition, the plaintiff cites instances in the customs statutes, regulations, and treasury decisions in which the phrase "in bond" is not synonymous with "in customs custody," see 19 U.S. C.A. §§ 1313(e), 1563(a); 19 C.F.R. § 18.1(a); or in which "in bond" is the antonym of "duty paid." See 19 U.S. C.A. § 1554.

We do not believe, however, that the usage of the phrase in plaintiff's dealings with third persons and its usage in customs statutes and regulations is as persuasive in revealing what the parties meant as (1) the evidence in the record which discloses what actually transpired between these two parties in preparing and formulating their contracts and (2) provisions in the contracts which indicate what the parties intended the phrase "in bond" to mean.

Mr. Green, president of the plaintiff, testified that he participated in discussions with the defendant in connection with its wool procurement program and that he assisted in drafting Announcement LS–262. He further testified that following these conferences a memorandum entitled "Recommendations For Purchase Agreement To Cover C.C.C. Wool Purchases" was sent to the defendant by the Boston Wool Trade Association. One of the committees of the Boston Wool Trade Association which signed these recommendations was the Public Relations Committee of which Green was chairman. Mr. L. Thornton Davis, who accepted the plaintiff's offers to sell the wool designated in the December wires on behalf of the defendant, testified that he participated in the conferences and meetings with the representatives of the wool trade and in the drafting of Announcement LS–262. The district court found that the terms and conditions of the announcement were arrived at after consultation and upon the recommendations of representatives of the wool trade including the president of the plaintiff corporation. Paragraph 2 of the recommendations states:

"2. Eligibility of Offerings.

"(a) Wool must have originated outside the United States, Canada, Mexico, Iceland, Alaska.

"(b) All wool that has not entered the commerce of the United States, namely wool in-bond, is eligible regardless of whether it was purchased or had arrived prior to date of sale to C.C.C."

The recommendations thus contain a definition of "in bond" that substantiate the defendant's interpretation of these words. Admittedly the recommendations were not incorporated into the contracts. But, in view of the fact that the terms and conditions of the contracts were arrived at upon the basis of these recommendations, we believe that the definition of the phrase in the recommendations is a strong indication of what the parties intended that phrase to mean in their contracts. And it is clear that the wool tendered by the plaintiff on Sepember 7, 1950, had prior

to that date entered the commerce of the United States. On May 16, 1951, the plaintiff made warehouse withdrawals of this wool conditionally free of duty for the purpose of carpet manufacture. The wool was then sold and delivered to Bigelow-Sandford Carpet Company of New York, N. Y.

Furthermore, the record reveals that the main source of the defendant's wool procurement program was intended by the parties to be foreign wool offered directly to the defendant upon its arrival in this country. The telegram sent by the defendant to the various Wool Trade Associations states: "Commodity Credit Corporation has been requested to undertake the acquisition of certain foreign wools for the Department of the Army. In an effort to develop a program which will not disrupt normal marketing conditions, you are invited to send representatives of your organization interested in foreign wools to participate in a discussion of a procurement program * * *." The contract between the defendant and the Quartermaster General specifies in Paragraph 1 that: "* * * CCC will acquire and sell to The Quartermaster General 30,000,000 pounds (plus or minus a tolerance of five percent) clean basis, of wool produced outside the United States * * *," and in Paragraph 2 that: "* * * CCC will inspect the wool at the port of entry or in the designated bonded warehouses promptly after arrival. * * *" Announcement LS–262 states in Paragraph 11 that: "* * * The vendor shall notify the Area Wool Office, Livestock Branch, 408 Atlantic Avenue, Boston 10, Massachusetts, upon the arrival in the bonded warehouse of

wool tendered under this announcement. * * *" Also Paragraph 18 states: "* * * At the time of arrival of shipments of wool under contract to Commodity Credit Corporation a separate declaration must be made to the Customs Bureau for each Item. * * *"

But under the terms of the contracts one type of wool is eligible for sale to the defendant, even though it may not have arrived from a source outside the United States immediately prior to its tender to the defendant. This wool is the so-called "spot wool," as defined in Paragraph 12 of Announcement LS–262.[2] There is no dispute that "spot wool" is in customs custody. Paragraphs 7 and 12 of the announcement contain detailed provisions on the manner in which "spot wool" is to be weighed and how a vendor may request an inspection of it. There are no similar provisions in the contracts, however, for wool that has been released from the custody of the Customs authorities and has entered the domestic commerce of the United States. By explicitly specifying that wool (1) which is stored in a bonded warehouse within certain areas and (2) upon which United States Customs duty has not been paid, we believe the parties have indicated the extent to which wool tendered from non-foreign sources is eligible for sale to the defendant.

Also, the testimony of the plaintiff's president, Mr. Green, clearly indicates that the parties intended "spot wool" to fix the boundary of wool eligible for sale to the defendant from sources within the United States. He testified:

"* * * This Committee was invited to Washington to work out a

2. "12. *Spot wool.* Vendors who propose to offer wool to CCC, under this announcement, that is stored in a bonded warehouse within the Eastern Seaboard Area of the United States at, or north of, Philadelphia, Pennsylvania, and upon which United States Customs duty has not been paid, may request the Area Wool Office, Livestock Branch, Boston, Massachusetts, to make an inspection of the wool prior to offering such wool to CCC. The request for inspection must

give full description of the wool, including the item number under which it will be offered to CCC and must be accompanied by a representative sample. CCC will, when feasible, endeavor to make such inspection and advise the vendor whether or not the wool meets the specifications of the item number under which the wool will be offered to CCC and, if the wool is accepted by CCC, will issue a certificate as provided in paragraph 11 of this announcement."

program that Congress passed to buy 30,000 (sic) pounds of foreign wool to bring in for this country. This Committee was purely invited down there to assist them to line up the types of wools after the Quartermaster had advised them what grades they wanted. They were there to assist them to line up the types of wool, and so forth, and the terms of contract, and so forth, and they started off by wanting everything imported into the country. They wound up by allowing people to sell CCC wool that had been in bond for any amount of years, sitting in the country.

\* \* \* \* \* \*

"Q. What does that mean to you 'wool in bond'? A. It is wool in bond, just under the custody of Customs."

█ The plaintiff contends that even if the contract meant that the wool must remain in Customs custody until delivery, the breach was not material enough to excuse performance by the defendant. It is argued that the wool was for the most part bought and imported by the plaintiff specifically for delivery under the contracts and that, while it may have been temporarily diverted to domestic use because the plaintiff was not aware it could be regraded, the plaintiff promptly recovered it, regraded it, and then offered exactly the type of wool which the defendant's purchasing program intended to be brought into this country.

We do not agree. As we have already stated, the wool tendered by the plaintiff had entered the domestic commerce of the United States. The purpose of the government's purchasing program was only to purchase wool directly from foreign sources or wool which had remained in Customs custody. The program did not contemplate purchasing wool which at some time or other had come from a foreign source and subsequently had entered the domestic commerce of the United States. In analogous situations the consequences of releasing wool under a "carpet bond" in accordance with the provisions of 19 U.S.C.A. § 1001, par. 1101 (b) are not merely "technical." For example, goods in the custody of Customs may be re-exported without the payment of duties. 19 U.S.C.A. § 1557. If the goods are released by the Customs authorities conditionally free of duties, however, the importer may not later re-export them without the payment of duties. 19 U.S.C.A. § 1558, Khosrovschahi & Co. v. United States, 1951, 39 C.C.P.A., Customs, 40. Also, there was testimony that it was the established practice of the Customs authorities under the provisions of 19 C.F.R. 10.91(c) to refuse to restore to Customs custody goods which have been withdrawn under a "carpet bond."

With respect to the defendant's amended counterclaim, Paragraph 20 of Announcement LS–262 provides:

"20. *Liquidated Damages.* The vendor shall pay to CCC, as liquidated damages, and not as a penalty, an amount equal to five (5) percent of the sales price specified in the Offer to Sell, of any wool which the vendor shall fail to deliver to CCC in accordance with an accepted Offer to Sell, unless such failure to deliver is one for which the vendor is excused pursuant to the provisions of paragraphs 4 or 19 of this announcement, and vendor, by submitting an Offer to Sell pursuant to this announcement, agrees that any such unjustified failure of delivery will damage CCC in the amount specified."

The quantity of wool deliverable under the contract designated by the defendant by the symbols A1PM (FF) 27042 was 196,000 pounds. From this figure the plaintiff is permitted to deduct 19,600 pounds under the provisions of paragraph 5 of the Announcement [3] and 98,-

---

**3.** "5. *Tolerance.* The contract shall be considered to be satisfied by the delivery of the contract quantity, within a plus or minus tolerance of ten (10) per cent in

000 pounds for wool delivered to the defendant in April of 1951.[4] The clean content of the wool rejected was 70%,[5] and thus the clean weight of the wool which the defendant failed to deliver under this contract was 54,880 pounds. Five percent liquidated damages on this quantity of wool at the contract price of $1.88 per pound amounts to $5,158.72. By the same process, the liquidated damages under the contract designated by the defendant by the symbols A1PM (FF) 27058 amount to $459.68. The defendant, therefore, is entitled to recover $5,-618.40 on its amended counterclaim.

The judgment of the district court is vacated and the case is remanded to that court for entry of judgment for the defendant on its amended counterclaim in the amount of $5,618.40.

WOODBURY, Circuit Judge (dissenting).

I would affirm the judgment for the reasons stated in the opinion of the District Court.

pounds, without regard to shrinkage results."

4. See Finding No. 16, supra.

5. "6. *Clean Content.* Final settlement shall be based upon the clean content of the wool delivered to Commodity Credit Corporation, as determined by the United States Customs Bureau, whose determinations, subject to the appeals permitted by the regulations of the United States Customs Bureau, shall be final."